[Cite as *State v. Tucker*, 2017-Ohio-7735.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                :

      Plaintiff-Appellee,                 :                No. 15AP-1123
                                                                        (C.P.C. No. 14CR-4758)
v.                                              :
                                                                        (REGULAR CALENDAR)
Andre Tucker,                                :

      Defendant-Appellant.               :

---

D E C I S I O N

Rendered on September 21, 2017

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued:** *Barbara A. Farnbacher*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Andre Tucker, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of two counts of theft.

{¶ 2} On September 5, 2014, appellant was indicted in Franklin C.P. No. 14CR-4758 for two counts of theft, in violation of R.C. 2913.02, both felonies of the fifth degree. On January 28, 2015, appellant was indicted on an unrelated charge of burglary in Franklin C.P. No. 15CR-424.

{¶ 3} Both cases came for trial before a jury beginning October 19, 2015. The first witness for plaintiff-appellee, State of Ohio, in the theft case (No. 14CR-4758) was Dr. Jim Lahoski, the Superintendent of the North Central Ohio Educational Service Center

("NCOESC"). NCOESC is a non-profit educational entity with offices in Marion, Mansfield, and Tiffin, Ohio. NCOESC provides services to public and community (i.e., charter) schools, and those services include acting as a sponsor for community schools. NCOESC also works with a third-party company that "provides particular services to the community schools." (Tr. Vol. II-A at 9.)

{¶ 4} The Ohio Department of Education ("ODE") provides funding for community schools and is required to approve sponsorship contracts between a community school and a sponsor such as NCOESC. Dr. Lahoski testified there is a significant application process to obtain community school sponsorship. In October 2012, appellant contacted NCOESC and expressed "great interest in beginning a community or a charter school." (Tr. Vol. I at 35.) Dr. Lahoski and several administrators met with appellant, who made a "very convincing * * * presentation." (Tr. Vol. I at 5.) Appellant subsequently entered into contracts with NCOESC to open two community schools, the Talented Tenth Leadership Academy ("TTLA") for Girls and the TTLA for Boys. Dr. Lahoski identified the state's exhibits Nos. 3 and 4 as contracts between the boards of NCOESC and TTLA.

{¶ 5} NCOESC employed appellant under two separate contracts; under the first, effective June 3 through July 31, 2013, appellant served as an educational consultant with duties which included "recruiting students, marketing, securing facilities, policy development, grant writing and securing food service proposals." (Tr. Vol. II-A at 29.) Under the second contract, a two-year agreement with an effective date of August 1, 2013 to July 31, 2015, appellant served as "superintendent, executive director, for [TTLA] with an annual salary of $70,982." (Tr. Vol. II-A at 29.)

{¶ 6} As a community school sponsor, NCOESC is responsible for monitoring the activities of schools with respect to issues of performance, safety, curriculum, and compliance. Among other requirements, Ohio law mandates minimum enrollment criteria for a community school (i.e., a minimum enrollment of 25 students).

{¶ 7} Dr. Lahoski testified that appellant lacked qualifications required by NCOESC to serve as the fiscal officer for TTLA for Girls or TTLA for Boys. Specifically, NCOESC requires a certificate indicating an individual is "licensed as a fiscal officer, a treasurer for such a school." (Tr. Vol. II-A at 51.)

{¶ 8}   Dr. Lahoski testified as to the circumstances leading to the closure of TTLA for Girls and TTLA for Boys in fall 2013, including the fact that TTLA "failed to have the number of children they predicted." (Tr. Vol. II-A at 23.)   TTLA was "paid by the state for the estimated number of 72 students when, in fact, on October 14, 2013, there were 14 in one school and * * * 12 in the other school, and the minimum requirement is 25 students." (Tr. Vol. II-A at 23.)   Dr. Lahoski stated that TTLA also "failed to complete the proper record keeping," and "failed to provide proper * * * information to register the kids."  (Tr. Vol. II-A at 23.)   On November 20, 2013, NCOESC abolished appellant's position with NCOESC for failure to meet minimum requirements for enrollment and for safety issues involving the schools.  NCOESC also suspended operation of the schools at that time.

{¶ 9}   Thomas Holmes, legal counsel for NCOESC, testified that Ohio statutory law provides procedures for the distribution of remaining assets of a community school upon its closure; once a community school is suspended, all operations must cease, including financial activities.  Holmes testified that he was involved in the distribution of assets after the closure of the two TTLA schools.

{¶ 10} Holmes identified state's exhibit No. 15 as "a check issued by the Ohio Department of Education in the amount of $6,317.96 * * * to Talented Tenth Leadership Academy for Girls, dated September 16, 2013."  (Tr. Vol. II-A at 92.)   He identified state's exhibit No. 16 as "a check issued by the Ohio Department of Education in the amount of $1,182.04 * * * to the Talented Tenth Leadership Academy for Boys, dated October 15, 2013."  (Tr. Vol. II-A at 92.)

{¶ 11} On October 31, 2013, Holmes e-mailed appellant regarding the "return of missing property and these two checks issued by the Department of Education."  (Tr. Vol. II-A at 94.)   On November 1, 2013, appellant "indicated that he would return those two checks to Mandy France, * * * the fiscal officer of both community schools at the time." (Tr. Vol. II-A at 94.)   Several weeks later, Holmes had a telephone conversation with appellant concerning the two checks, and appellant "indicated that he did not have the checks.  He said they were locked in a storage facility at the building where the community school was previously located."  (Tr. Vol. II-A at 94.)   Holmes followed up with written correspondence to appellant on November 21, 2013, stating it was necessary for him to return the checks; Holmes never received the checks from appellant.  Holmes

testified that NCOESC suspended operations of the community schools, at the latest, on November 9, 2013.

{¶ 12} NCOESC assigned one of its employees, Mandy France, to serve as Treasurer/Fiscal Officer for TTLA for the 2013-2014 school year. France's duties included maintaining the records of the school at all times during her term of assignment. A payment from the state to a community school is termed "a foundation settlement payment." (Tr. Vol. II-A at 144.) As treasurer, France was the only individual authorized to spend funds from TTLA accounts. France opened two accounts with Chase Bank to handle the funds for TTLA for Girls and TTLA for Boys; according to France, all community school funds were to be placed in those accounts.

{¶ 13} France testified that she never received the check issued by ODE to TTLA in the amount of $6,317.96 (state's exhibit No. 15) for deposit into the Chase Bank account. France similarly testified that she never received the check issued by ODE to TTLA in the amount of $1,182.04 (state's exhibit No. 16) for deposit into the Chase Bank account. On November 1, 2013, France resigned from her responsibilities as fiscal officer for TTLA because of a "lack of cooperation and the leadership that it needed to carry through with the school due to the school closing." (Tr. Vol. II-A at 140.)

{¶ 14} Cody Loew is the assistant director of ODE's Office of Budget and School Funding, and his responsibilities include ensuring that ODE makes accurate and timely payments to community schools. Loew became aware that TTLA for Girls and TTLA for Boys closed after "issues were brought to our attention that there were safety and health concerns." (Tr. Vol. II-B at 10.) Once a school is closed, ODE acts to "completely stop the payments to them and move to collect any funds that are owed back to [ODE]." (Tr. Vol. II-B at 11.) In the event of a closure, the sponsor of a community school acts as the receiver for the school.

{¶ 15} Loew identified state's exhibit Nos. 15 and 16 as foundation settlement payment checks issued by ODE to TTLA for the purpose of educating students, operating schools, and paying teacher salaries. According to Loew, the checks were not used for their intended purposes. Loew testified that a fiscal officer for NCOESC contacted ODE about attempting to reconcile foundation settlement payments "because they couldn't find these checks." (Tr. Vol. II-B at 7.) Loew related that ODE "started to look into it; we looked up the Ohio treasury website, found these checks, found that the signatures on the

back did not match checks for previous foundation checks, looked further into the warrant number to find that these checks were deposited into bank accounts that weren't the primary ones for the school." (Tr. Vol. II-B at 7.) The ODE treasury found "no record of these [checks] being deposited into the actual accounts for the school." (Tr. Vol. II-B at 7.) ODE subsequently "turned it over to the police for further investigation." (Tr. Vol. II-B at 7.)

{¶ 16} Columbus Police Detective Todd Schiff is a member of the department's economic crime unit which investigates white collar financial crimes. Detective Schiff became involved in the investigation of TTLA after ODE filed a report with the Columbus Police Department. The detective, after speaking with officials at ODE as well as employees of NCOESC (Dr. Lahoski and France), learned that two ODE checks issued to TTLA had not been deposited into the designated accounts with Chase Bank. ODE informed the detective that the checks had been deposited into an account with Charter One Bank ("Charter One"), opened in the name of TTLA for Girls. Appellant's signature appeared on the signature card for the account, and appellant's home address was listed as the address on the account. The Charter One account had been opened December 1, 2013; Detective Schiff determined that the $6,317.96 check for TTLA for Girls was deposited into that account on December 2, 2013, while the $1,182.04 check for TTLA for Boys was deposited into the account "approximately a month later." (Tr. Vol. II-B at 42.)

{¶ 17} The detective reviewed a bank statement showing purchases from the account, including purchases made from Wendy's and Giant Eagle. The statement also indicated ATM cash withdrawals. Among the expenditures, the detective identified two Giant Eagle money orders for $500 each, purchased on December 9, 2013, "made out to Corina Pierce," the wife of appellant. (Tr. Vol. II-B at 36.) Money orders from Giant Eagle had also been purchased and made payable to appellant.

{¶ 18} Detective Schiff determined that $1,031 in money orders purchased from Giant Eagle had been made payable to "Hilliard Summit," the apartment complex where appellant resided. (Tr. Vol. II-B at 37.) He identified another money order in the amount of $500, made payable to Primrose Hilliard, which the detective determined had been expended for daycare for the daughter of appellant and Pierce. Detective Schiff also noted a purchase from Giant Eagle for $144.94, of which $123.26 was paid for with an EBT food stamp card belonging to Pierce, and $20.84 was "paid for with a debit card of Talented

Tenth Leadership Academy." (Tr. Vol. II-B at 41.) According to the detective, the transaction raised "red flags" because, assuming the purchase was a legitimate expense for TTLA, the entire amount "would have been paid for out of the TTLA funds." (Tr. Vol. II-B at 41.) Detective Schiff could not identify any transactions he deemed to be expenses attributable to the operation of a school.

{¶ 19} Detective Schiff interviewed appellant on May 27, 2014. Appellant told the detective that he was owed money by NCOESC. Appellant acknowledged opening a TTLA account with Charter One to deposit the two checks from ODE. Appellant told the detective he "had problems with Mandy France, the treasurer with North Central Ohio; and at his board's discretion and his board's authority, he stated that's how he opened up the TTLA account at Charter One and deposited those checks." (Tr. Vol. II-B at 48.) Appellant also told the detective he fired France, and "there was no one in place to accept those checks as the reason why he set up that account." (Tr. Vol. II-B at 48.) At the time of the interview, Detective Schiff had information from NCOESC indicating that France resigned as treasurer for TTLA on November 1, 2013; appellant, however, "stated he had fired her prior to that date." (Tr. Vol. II-B at 48.)

{¶ 20} Detective Schiff questioned appellant as to expenditures made from the Charter One account. Appellant told the detective that "all of the money was used to pay an intern, to reimburse staff or various expenditures to pay the caterer for food services." (Tr. Vol. II-B at 50.) When asked by the detective whether he had any documentation for those expenditures, appellant "stated he did not have that at the time of the interview, but he did have that and could provide that to me." (Tr. Vol. II-B at 51.) The detective received a spreadsheet document from appellant on July 29, 2014, but appellant did not provide any supporting documentation such as receipts or invoices for the expenditures. Appellant told the detective that he became the fiscal officer for both schools "per Dr. Lahoski's request." (Tr. Vol. III at 21.) The detective cited a lack of checks and balances as to appellant's expenditures from the TTLA treasury.

{¶ 21} The state also presented testimony from several witnesses with respect to the burglary case (case No. 15CR-424). At the close of the state's case, counsel for appellant made a motion for acquittal as to all charges. The trial court denied the motion.

{¶ 22} Appellant testified on his own behalf in case No. 14CR-4758. In 2013, appellant resided on Meadows Way, Hilliard, Ohio. Appellant created TTLA, and the

business address was the same as his residential address. Appellant testified that he was the fiscal officer for TTLA during the "pre-development phase." (Tr. Vol. III at 186.) He served as the executive director of the schools and also had a two-year contract with NCOESC.

{¶ 23} In May 2013, appellant began receiving checks from NCOESC. TTLA and NCOESC entered into a third-party agreement with Charter School Management Corporation, and NCOESC provided TTLA with a treasurer. The first day of school for both TTLA for Girls and TTLA for Boys was September 25, 2013. The two schools held classes at separate leased locations.

{¶ 24} Appellant stated that TTLA had two boards for each school, a "pre-operations board" and a "post-operations board." (Tr. Vol. IV-A at 3.) Appellant's wife, Corina Pierce, served on the pre-operations board. When the schools opened, there were five TTLA board members. Appellant testified that his board hired Mandy France as treasurer, and that France's salary was paid by NCOESC.

{¶ 25} During fall 2013, both schools experienced problems with the landlord of the respective leased locations. On October 18, 2013, the schools "received an unofficial notice of suspension" from NCOESC. (Tr. Vol. IV-A at 13.) Appellant sought and obtained a temporary restraining order from Wyandotte County based on an alleged "Ohio open meetings violation." (Tr. Vol. IV-A at 16.)

{¶ 26} Appellant testified that he continued to operate the schools at various locations, including a public library and "Fort Rapids." (Tr. Vol. IV-A at 17.) He related that "it was not a full-blown school. * * * Some days it was 12 kids; some days it was 27 kids. It just varied." (Tr. Vol. IV-A at 17.) According to appellant, expenses "hadn't been paid yet prior to the school being suspended." (Tr. Vol. IV-A at 19.) Appellant stated that he compensated interns "for the time period October 28th through the beginning of January 2014." (Tr. Vol. IV-A at 19.) Appellant testified that he provided the food service for the schools during that time, and that he purchased food from various places, including Wendy's, Burger King, Super Chef, and Giant Eagle.

{¶ 27} Appellant acknowledged opening an account with Charter One around the beginning of December 2013, stating that his board authorized the account. He deposited two checks from ODE into the account. According to appellant, the account "did not provide checks. So we used money orders and an ATM debit card." (Tr. Vol. IV-A at 31.)

With respect to a $500 expenditure to "Primrose Hilliard," appellant stated that he used his "health benefits expenses to pay for my daughter's tuition." (Tr. Vol. IV-A at 40.) He also testified that TTLA had a lease agreement with "Hilliard Summit Schottenstein property" for three months during the pre-operational phase. (Tr. Vol. IV-A at 45.) Appellant stated that he terminated TTLA's relationship with Mandy France on October 29, 2013.

{¶ 28} On cross-examination, appellant acknowledged that he could not operate a community school without a sponsor, and that he never received permission to operate the TTLA schools independent of a sponsor. Appellant opened the Charter One account on November 30, 2013, after he told legal counsel for NCOESC that he could not find the checks at issue. Appellant admitted that the Charter One account was overdrawn in January 2014. Appellant was unable to state how many days in December 2013 the school was in operation. He acknowledged that $100 from the Charter One account was used as payment for one of his student loans, explaining that the payment was a mistake and that $100 was paid back to ODE in January 2014. He also acknowledged sending an e-mail to Thomas Holmes on November 1, 2013, in which appellant stated that France was still treasurer for TTLA.

{¶ 29} Following deliberations, the jury returned verdicts finding appellant guilty of two counts of theft in case No. 14CR-4758. The jury returned a verdict of not guilty of burglary in case No. 15CR-424. By judgment entry filed November 19, 2015, the trial court imposed a sentence of five years of community control sanctions and ordered appellant to pay restitution to ODE.

{¶ 30} On appeal, appellant sets forth the following three assignments of error for this court's review:

> I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF THEFT AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**II. APPELLANT'S TRIAL COUNSEL WERE INEFFECTIVE, THEREBY DENYING HIM HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

**III. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.**

{¶ 31} Under his first assignment of error, appellant challenges his theft convictions as not supported by sufficient evidence and as against the manifest weight of the evidence. Appellant disputes the state's theory that he expropriated public monies for his own use, portraying his actions instead as that of a bad recordkeeper who was attempting to keep the community schools in operation despite unforeseen setbacks. He further maintains that the TTLA board authorized many of the expenditures claimed as theft.

{¶ 32} Under Ohio law, sufficiency of the evidence and weight of the evidence are distinct legal concepts. *State v. Stone,* 1st Dist. No. C-040817, 2006-Ohio-1375, ¶ 10. In *State v. Sexton,* 10th Dist. No. 01AP-398, 2002-Ohio-3617, ¶ 30-31, this court addressed those distinctions, stating in part as follows:

> To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proved beyond a reasonable doubt. * * * Sufficiency is a test of adequacy, a question of law. * * * We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. * * * We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. * * * A conviction based upon legally insufficient evidence amounts to a denial of due process, * * * and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant.
>
> A manifest weight argument * * * requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. * * * Issues of witness credibility and concerning the weight to attach to

specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. * * * Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction.

{¶ 33} We initially consider appellant's sufficiency challenge. As noted, the jury returned verdicts finding appellant guilty of two counts of theft, in violation of R.C. 2913.02. R.C. 2913.02(A) states in part: "No person, with purpose to deprive the owner of property * * * shall knowingly obtain or exert control over * * * the property * * * (2) [b]eyond the scope of the express or implied consent of the owner or person authorized to give consent." R.C. 2901.22(A) states in part: "A person acts purposely when it is the person's specific intention to cause a certain result." Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶ 34} At trial, the state's theory of the case was that ODE provided funds to TTLA in the form of two checks (state's exhibit Nos. 15 and 16) issued for the purpose of operating community schools, but that appellant utilized those funds for personal expenditures. Witnesses for the state included the superintendent of NCOESC, Dr. Lahoski, who testified that appellant was not authorized to serve as fiscal officer for the community schools. NCOESC employee France, assigned to serve as treasurer for TTLA, testified that she was the only individual with authorization to receive money or write checks from the account she set up with Chase Bank. ODE employee Loew testified that foundation settlement payments issued by the state are for the purpose of educating students, operating schools, and paying teacher salaries. Holmes, legal counsel for NCOESC, testified that all operations, including financial activities, must cease in the

event a community school is suspended. According to Holmes, NCOESC suspended TTLA, at the latest, on November 9, 2013.

{¶ 35} The state also presented the testimony of Detective Schiff, who testified that appellant opened a Charter One bank account on December 1, 2013. The detective reviewed a bank statement from Charter One and noted various charges against the account, including a December 9, 2013 charge to Giant Eagle in the amount of $1,001.16, a December 13, 2013 charge to Giant Eagle in the amount of $1,076.74, and a January 3, 2014 charge to Giant Eagle in the amount of $1,031.74. The detective also noted "quite a few ATM cash withdrawals." (Tr. Vol. II-B at 35.) The detective discovered that the charges to Giant Eagle involved money orders, including three money orders totaling $1,030, payable to Hilliard Summit, "the name of the apartment complex where, at the time, [appellant] lived." (Tr. Vol. II-B at 37.) The detective identified three money orders totaling $1,500 payable to appellant's wife, Corina Pierce. The detective investigated a money order payable to "Primrose Hilliard" in the amount of $500, and "determined that this particular money order was for * * * day care for * * * the biological child of [appellant] and Corina Pierce." (Tr. Vol. II-B at 38.)

{¶ 36} Under Ohio law, "a jury may infer purpose from the surrounding circumstances." *State v. Graham,* 10th Dist. No. 09AP-896, 2010-Ohio-2907, ¶ 21, citing *State v. Buelow*, 10th Dist. No. 07AP-317, 2007-Ohio-5929, ¶ 25. As set forth above, the state presented evidence that appellant lacked qualifications required by NCOESC to serve as fiscal officer for TTLA, but that he nevertheless opened a separate bank account and funded the account with two checks issued by ODE and payable to TTLA for school operations; appellant took these actions after being notified by NCOESC that TTLA's sponsorship had been terminated, and after being contacted by legal counsel for NCOESC about returning the missing checks. As also noted, the state presented testimony by Detective Schiff that appellant utilized funds from the Charter One account to purchase money orders from Giant Eagle payable to himself and to his wife; further, that money withdrawn from the Charter One account was used to pay for rent at the apartment complex where appellant resided and for his daughter's daycare. According to testimony of the detective, none of the expenditures were for the purpose of operating a community school.

{¶ 37} While appellant sought to portray his expenditures as an attempt to keep the fledgling community schools open, the state presented contrary evidence which, if believed, was sufficient to show that appellant knowingly acted with purpose to deprive the state of property by exerting control over such property beyond the scope of the owner's express or implied consent. *See, e.g.*, *State v. Plunket,* 10th Dist. No. 78AP-809 (Dec. 28, 1979) (sufficient evidence to support finding that defendant was aware the control he exercised over investors' funds would probably exceed the scope of consent and that it was his specific intent to deprive investors of their money; defendant's contention that he made various expenditures to keep company operating not determinative, nor does such a motive exculpate him of criminal liability); *State v. Pellin,* 7th Dist. No. 11 MA 194, 2012-Ohio-5342, ¶ 22 (sufficient evidence to support theft conviction as it was reasonable to find that defendant's deposit of funds into undisclosed bank account was beyond the scope of authority granted by receiver or bankruptcy court's order; "even if * * * there was some authority to use the pre-existing account for certain items * * * a reasonable person could find that the withdrawals were beyond the scope of that authority" where checks were written to and cashed by defendant); *State v. Dortch,* 2d Dist. No. 17700 (Oct. 15, 1999) (Even where a person "lawfully has control over property with consent, that person cannot thereafter *exert* control for a different purpose."). (Emphasis sic.)   Here, viewing the evidence in a light most favorable to the state, a rational trier of fact could find all the elements of theft proven beyond a reasonable doubt. We therefore reject appellant's contention that his convictions are not supported by sufficient evidence.

{¶ 38} Nor do we find persuasive appellant's claim that his convictions are against the manifest weight of the evidence.  As noted, appellant sought to portray his conduct as that of a bad bookkeeper, and he points to his own testimony in support.  At trial, the jury had the opportunity to review the transactions recorded in the Charter One bank statement and to consider appellant's explanations for the expenditures.  The jury also heard the testimony of Holmes, legal counsel for NCOESC, who stated that he contacted appellant in November 2013 about returning the two checks because the schools were no longer operating.  Appellant assured Holmes he would find the checks and return them to the TTLA treasurer (France).  Instead, however, appellant subsequently opened the Charter One account, deposited the two checks, and used funds from the account to

purchase money orders made payable to his wife and himself. In rendering its verdicts, the jury obviously found more credible testimony and evidence presented by the state that undermined appellant's claims that various expenditures he made were for school operations rather than personal expenses, and it was within the jury's province to reject appellant's version of the events and to accept the state's version.

{¶ 39} On review, we are unable to conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice in convicting appellant of the two theft counts. Accordingly, the convictions are not against the manifest weight of the evidence.

{¶ 40} Based on the foregoing, appellant's first assignment of error is without merit and is overruled.

{¶ 41} We will address appellant's second and third assignments of error in inverse order. Under his third assignment of error, appellant contends the trial court erred in sentencing him to consecutive terms of incarceration without making the statutory findings required by R.C. 2929.14(C)(4). According to appellant, the record fails to justify the imposition of consecutive terms as he had no prior criminal record and was convicted of two felonies of the fifth degree.

{¶ 42} In response, the state argues the trial court was not required to make consecutive sentencing findings under R.C. 2929.14(C) as appellant was not sentenced to serve a prison term but, rather, was ordered to serve community control sanctions. We agree.

{¶ 43} R.C. 2929.14(C)(4), which requires a trial court to make specific findings before imposing consecutive sentences, states in part: "*If multiple prison terms* are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively." (Emphasis added.) Thus, "[t]he statute clearly states that the findings are required before a court imposes multiple prison terms." *State v. Carswell,* 8th Dist. No. 101313, 2015-Ohio-764, ¶ 9.

{¶ 44} Under Ohio law, "the purpose of the community control statute is not to sentence a defendant to a specific prison term and then suspend or reserve that prison term. * * * Rather, the purpose of the statute is to *notify* the defendant of a specific prison term that *may be imposed* if the defendant violates community control." (Emphasis sic.) *State v. Duncan,* 12th Dist. No. CA2015-05-086, 2016-Ohio-5559, ¶ 21. Thus, "when a defendant is sentenced to community control on a count of conviction and notified at that

time of the specific prison term he faces should he violate his community control, the defendant is only sentenced to community control sanctions and is not sentenced to that prison term." *Id.* In the event of a community control violation, R.C. 2929.15(B) "details procedures for a trial court to follow," and "provides that if a prison term is imposed upon the defendant for violating community control, the prison term must comply with R.C. 2929.14." *Id.* at ¶ 41.

{¶ 45} In the present case, the trial court's sentencing entry reflects the court imposed "a period of Community Control for five (5) years under basic supervision." (Emphasis omitted.) The court's entry further states that, following the imposition of community control, the court notified appellant, orally and in writing, "what could happen if he violates Community Control." Specifically, the entry states that the court "indicated that if [appellant] violates Community Control he would receive a prison term of eleven (11) months on each count, to be served consecutive to each other for a total of twenty-two (22) months."

{¶ 46} In *State v. Bates,* 6th Dist. No. WM-12-002, 2013-Ohio-1270, the reviewing court addressed a similar argument as the one posited by appellant in this case. Under the facts of *Bates,* the trial court sentenced the defendant to a four-year term of community control following a jury trial in which he was found guilty of various offenses, including identity fraud, menacing by stalking, and possessing criminal tools. On appeal, the defendant challenged his sentence arguing that the trial court erred "by ordering him to 'serve a consecutive sentence without making the appropriate findings required by [R.C. 2929.14(C)(4)].' " *Id.* at ¶ 67. The appellate court rejected this argument, holding in part:

> Bates' initial argument concerning consecutive sentences overlooks the fact that the trial court is not required to make statutory findings of fact under R.C. 2929.14(C)(4) when it sentences a defendant to community control in lieu of a consecutive prison sentence. *See State v. Madaffari,* 12th Dist. No. CA2004-08-193, 2005-Ohio-3625, ¶ 14 (concluding that "a trial court is required to make the statutory findings and supporting reasons * * * not when it sentences a defendant to community control, but when it actually imposes a consecutive prison term."). Since Bates' consecutive prison sentence does not apply unless he violates the terms of his community control, that sentence has not been "actually

> imposed."  Thus, the trial court did not err in failing to make the statutory findings of fact under R.C. 2929.14(C)(4).

*Id.* at ¶ 68.

{¶ 47} Similarly, in the instant case, the trial court sentenced appellant to community control sanctions in lieu of a prison term and, therefore, the court did not err in failing to make consecutive sentencing findings under R.C. 2929.14(C)(4).  *Id.  See also State v. Malone*, 3d Dist. No. 9-15-42, 2016-Ohio-5556, ¶ 14 (following decision by Eighth District Court of Appeals in determining that statutory findings under R.C. 2929.14(C)(4) do not apply when a period of community control sanctions is ordered to be served consecutive to a prison term).

{¶ 48} Accordingly, appellant's third assignment of error is overruled.

{¶ 49} Under his second assignment of error, appellant argues that his trial counsel was ineffective in (1) failing to object to the joinder of the two cases (case Nos. 15CR-424 and 14CR-4758), and (2) by waiving the statutory findings for consecutive sentences. With respect to the issue of joinder, appellant argues that the indictments for theft and burglary should not have been tried together because the two cases involved completely unrelated offenses.

{¶ 50} Appellant notes that, prior to trial, his trial counsel requested the court to grant severance of the two criminal cases, which the court was prepared to do.  Trial counsel, however, elected to go forward on both cases after the trial court reminded counsel that, once jeopardy attached, the court would dismiss the burglary case with prejudice if the state was unable to produce its witness.  Appellant further notes that, during the middle of his testimony on the theft offense, the state located a missing witness in the burglary case and presented the testimony of that individual.

{¶ 51} Under Ohio law, trial counsel's performance "will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. In order to show that a defendant has been prejudiced by his or her counsel's deficient performance, "the defendant must prove that there exists a reasonable probability that,

were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 52} In the instant case, the record indicates that trial counsel initially objected to joinder of the cases, arguing that the cases were "totally unrelated." (Tr. Vol. I at 5.) The trial court responded: "I can separate them and continue the case and then he's looking at a burglary charge; or, we can go forward and if they don't produce the witness it gets [nolled]. So you can make a tactical, strategic[] decision and I'm happy to accommodate you in either regard." (Tr. Vol. I at 5.) The trial court, noting that "jeopardy attaches when the jury is impaneled and sworn," further stated on the record that if the prosecutor was "not prepared to go forward by the time the jury is impaneled and sworn on that case, I'll either dismiss it or he'll [nolle] it." (Tr. Vol. I at 6.) In response, defense counsel made the decision to go forward with both cases, and the state proceeded to call its witnesses in the theft case. The state subsequently located a primary witness in the burglary case. At that time, counsel for appellant made a request to "renew our motion to sever" the burglary case from the theft case, "[e]specially after going through the theft portion of the state's case." (Tr. Vol. III at 60.) Defense counsel argued that it would be prejudicial to proceed with evidence of the burglary offense given the amount of evidence the jury had already heard with respect to the theft offense. The trial court overruled defense counsel's motion to sever.

{¶ 53} On review, appellant has failed to demonstrate deficient performance by trial counsel regarding the issue of joinder. Under Ohio law, "[t]rial strategy does not constitute ineffective assistance of counsel." *State v. Diaz,* 8th Dist. No. 103878, 2016-Ohio-5523, ¶ 67. As noted above, defense counsel initially sought severance of the cases. However, because of uncertainty as to whether the state would be able to obtain the testimony of a witness in the burglary case, counsel made a strategic decision to proceed with both cases following the trial court's comments regarding the potential for dismissal of the burglary charge if the state was unable to locate the witness. As also noted, once the witness became available, defense counsel renewed the motion to sever the cases. Under these circumstances, appellant cannot show that counsel's strategy was unreasonable, or that the actions of counsel constituted deficient performance. *See State v. Dantzler,* 10th Dist. No. 14AP-907, 2015-Ohio-3641, ¶ 21 ("the decision to file a motion for separate trials or to proceed with the joinder of the offenses may be a matter of counsel's trial strategy").

{¶ 54} Further, we agree with the state's contention that appellant has also failed to demonstrate prejudice, as he was acquitted of the charge in the burglary case (case No. 15CR-424), indicating the jury was able to "separate the evidence" as to the offenses. *State v. Wampler,* 5th Dist. No. 13-CA-3, 2014-Ohio-37, ¶ 74 (appellant failed to demonstrate prejudice from joinder of counts where jury acquitted him of all counts related to alleged incident of arson on date separate from the date of the incident for which he was convicted).

{¶ 55} Appellant also claims deficient performance based on his counsel's waiver of findings with respect to consecutive sentences. Specifically, at the time of sentencing, the trial court, after informing appellant that the court was not going to impose a prison term, inquired of defense counsel if he was "going to waive consecutive findings?" Counsel responded, "Yes, your Honor." (Tr. Vol. V at 16.)

{¶ 56} As previously addressed under the third assignment of error, the trial court, having imposed a sentence of community control, was not required to make statutory findings under R.C. 2929.14(C)(4). Thus, defense counsel's affirmative response to the trial court's inquiry as to whether counsel was waiving "consecutive findings" did not constitute deficient performance.

{¶ 57} Accordingly, appellant's second assignment of error is not well-taken and is overruled.

{¶ 58} Based on the foregoing, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

KLATT and BRUNNER, JJ., concur.

————————————